J-S22034-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN RE: T.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 365 WDA 2023 |

Appeal from the Decree Entered March 15, 2023
In the Court of Common Pleas of Armstrong County
Orphans' Court at CP-03-DP-0000015-2022

BEFORE:  OLSON, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED: August 16, 2023**

K.S. (Mother) appeals from the decree granting the petition of Armstrong County Children, Youth and Family Services (CYF) to involuntarily terminate her parental rights to T.S. (Child).[1]  We affirm.

The orphans' court recounted the following case history:

> [Child] was born [] February [], 2021, at Armstrong County Memorial Hospital ("ACMH").

> Mother and Father were the parents of another son; their parental rights to [the other son] were involuntarily terminated in 2017[,] due to the parents' living conditions and mental health issues, and their lack of progress on the goals outlined in the family service plan provided to them.

---

[1] Child's father, D.S. (Father) "passed away on September 20, 2021, after [Child] was taken into protective custody, but before the filing of the [termination] petition."  Orphans' Court Findings and Memorandum, 3/15/23, at 1.  In discussing Mother's appeal, the orphans' court notes that it "mentions [Father's] diagnoses to illustrate one of the reasons various services were initiated and continued to be offered to Mother."  ***Id.*** at 3 n.2.

On February 11, 2021, due to the fact that Mother's parental rights to another child had been terminated, CYF filed an Application for Emergency Protective Custody of [Child], which the [c]ourt granted. The [c]ourt entered a Shelter Care Order on February 16, 2021, and adjudicated [Child] dependent on May 26, 2021. [Child] was placed into kinship care with his maternal grandparents, where he continues to reside.

Mother and Father at the time lived in a trailer found to be unsafe. Mother did not secure other housing until March 2022.

A permanency plan was put in place, and CYF referred Mother to Dr. Carol Patterson for Psychological and Parenting Assessments.

On March 11, 2021, Dr. Patterson conducted Psychological/Parenting Assessments on Mother and Father. She administered standard tests, and read everything to Mother to insure she understood. She diagnosed Mother with Bipolar I Disorder and concluded that all factors placed Mother at risk with regard to her ability to parent a child. ... Dr. Patterson recommended that Mother receive mental health services, a psychiatric evaluation, and parenting services.

In late February 2021, Mother began receiving services with Alternative Community Engagement Solutions ("ACES"). Those services consisted of parenting instruction and conducting supervised visits between Mother and [Child]; the services were initially provided at CYF's offices, but were later held at Mother's residence. Services were fully supervised until May 17, 2022, and were then provided several times a week for short amounts of time. ACES services continued to December 6, 2022.

Teaching Mother parenting skills consisted of a nurturing packet and a parenting packet. The nurturing packet consisted of hands-on parenting instruction, such as telling Mother to change [Child's] diaper and wiping food from [Child's] face. The parenting packet consisted of different scenarios and ways of dealing with things like stressful days. Some sections of the parenting packet required a choice between true and false, and Mother would often answer "both." During one incident on July 14, 2022, Mother was asked to choose between true and false, but broke down. [The ACES parenting instructor,] Ms. Hauser[,] would not have

expected that reaction almost a year after ACES began providing services.

Mother exhibited progress in fulfilling [Child's] emotional needs [to feel] loved and secure. The most concerning thing to Ms. Hauser was Mother's very black-and-white thinking and Mother's [in]ability to make decisions under pressure. Ms. Hauser's initial concern was that if anything medical came up with [Child] and Mother had to make a snap decision, whether Mother would be able to do that.

Ms. Hauser was at Mother's residence a number of times from July to October 2022. She would walk through the entire residence; Mother had safety gates and electrical covers in place. However, Ms. Hauser had cleanliness concerns. Over time, Ms. Hauser observed clutter, cat throw-up on the floor, dried food all over the stovetop, sinks and counters full of dirty dishes, and garbage on the kitchen floor. She also smelled cat urine. Ms. Hauser discussed these concerns with Mother and recommended getting more litter boxes and using baking soda to soak up the odor. Mother expressed cooperation and a willingness to do those things, but she never did. At one point the cat urine smell was so prominent that Ms. Hauser asked Mother to clean the carpet; Mother did so.

Ms. Hauser testified that Mother had received "the whole gamut" of services available to anyone in Mother's situation. After a year of services, Ms. Hauser would expect Mother to be able to multitask, keep the kitchen and bathroom clean, and provide for [C]hild's needs. Mother's decision making was a concern, such as whether she should give [Child] baby food or what he should eat for a snack. Several times Mother would call her own mother first for her opinion or suggestion.

As noted in her ending report of November 11, 2022, Ms. Hauser observed a number of troubling conditions in Mother's home during the review period from July through October 2022. …

Orphans' Court Findings and Memorandum, 3/15/23, at 2-6 (paragraph numbers and footnotes omitted).

On November 21, 2022, CYF filed a petition to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (5), (8) and (b). The orphans' court held hearings on February 17 and 28, 2023. By decree entered March 15, 2023, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (5), (8) and (b).

Mother timely filed a notice of appeal and concise statement of matters complained of on appeal. The orphans' court stated that "[b]ased upon [Mother's] Concise Statement, the court reiterates its Findings and Memorandum filed on March 15, 2023, in support of its decision." Rule 1925(a) Memorandum, 3/30/23.

Mother presents the following questions for review:

I. Did the [orphans'] court abuse its discretion, and err as a matter of law[,] as [CYF] failed to present clear and convincing evidence supporting termination of parental rights?

II. Did the [orphans'] court err in determining it is in the Child's best interest to terminate Mother's parental rights?

Mother's Brief at 7.

In considering Mother's issues,

our standard of review requires [this Court to] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

> [T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We [have] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

CYF has the burden to prove by clear and convincing evidence that its asserted grounds for termination are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). "[T]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* Under 23 Pa.C.S.A. § 2511, "the court must engage in a bifurcated process prior to terminating parental rights." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the focus is on the conduct of the parent pursuant to Section 2511(a). *Id.*

## Section 2511(a)

Mother challenges the termination of her rights under Section 2511(a)(1), (5), and (8). This Court need only agree "as to any one subsection in order to affirm the termination of parental rights." *In re A.S.*,

11 A.3d 473, 478 (Pa. Super. 2010). Accordingly, we address subsection

(a)(5), which provides for termination when:

> The child has been removed from the care of the parent by the court … for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(5).

Termination "under Section 2511(a)(5) requires that: (1) the child has

been removed from parental care for at least six months; (2) the conditions

which led to removal and placement of the child continue to exist; and (3)

termination of parental rights would best serve the needs and welfare of the

child." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citation omitted).

> The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have his parental rights terminated.

*Id.* (citation omitted).

Mother concedes that Child has been removed from her care for more

than six months. However, Mother argues

> no evidence was presented to substantiate that the conditions that led to the removal or placement continue to exist, that [Mother] will not remedy those conditions in a reasonable time, and the services or assistance available will not remedy the conditions that

led to removal. By the time termination was filed … Mother had changed housing to a suitable home and likewise had sought and continued to participate in mental health treatment. Although it would appear that Mother had a backslide in November of 2022, all the prior reports reflect that Mother had made substantial strides and had the ability to continue in making more strides with the proper support in place. Perhaps most importantly, the parental bond with the Child appears to be strong. The testimony … reflects that even CYF's own witnesses testified that Mother clearly loved the Child and was bonded to the Child, Mother maintained almost all visits, Mother clearly took direction from all parties and tried her best to complete all tasks and goals.

Mother's Brief at 25-26.

CYF counters, "Each of the findings of fact made by the [o]rphans' court were supported by the evidence of record and the application of the law was appropriate to the facts." CYF's Brief at 8. CYF observes that despite Mother moving to a new residence, "there remain ongoing concerns about the condition of the home," which reflect "issues that continue to exist concerning [M]other's ability to maintain a safe and clean home for [C]hild." *Id.* at 14-15. According to CYF, "Parenting was another issue that led to the placement of [C]hild and despite services being provided by ACES and Justice Works[,] this issue continues to exist." *Id.* at 15 (citing testimony from three psychologists: Carol Patterson, M.Ed., Dr. Carolyn Menta, and Dr. Douglas Della Toffalo). CYF also asserts that Mother continues to experience mental health issues. *Id.* at 16-17 (referencing Dr. Della Toffolo's diagnoses and opinions). Thus, CYF avers Mother "cannot or will not remedy the situation that led to the placement of [Child] within a reasonable amount of time," such

that termination would best serve Child's needs and welfare. *Id.* at 17, 19. *See also* 23 Pa.C.S.A. § 2511(a)(5).[2]

The record supports termination under Section 2511(a)(5). The court granted CYF protective custody of Child shortly after Child's birth in February 2021, and placed Child with his maternal grandparents, where he continues to live. CYF provided Mother with a parenting plan and a variety of services, with minimal success. In November 2022, CYF petitioned to terminate Mother's parental rights.

At the termination hearing, Dr. Della Toffalo testified to conducting an initial neuropsychological evaluation of Mother in February 2022, and a supplemental evaluation in July 2022. N.T., 2/17/23, at 8; Petitioner's Exhibit 3. Dr. Della Toffalo explained that "a neuropsychological evaluation goes above and beyond the typical psychological evaluations … to assess more in depth … specific cognitive functions." *Id.* at 11. Dr. Della Toffalo addressed Mother's "parenting deficiencies," which include an IQ of 92, "in the very lower limit of the average range," autism, and resistance to change. *Id.* at 14, 19. Dr. Della Toffalo opined that Mother "could not overcome the deficiencies in the eight- or nine-month period" between the evaluation and the termination hearing. *Id.* at 19, 32. He expressed

---

[2] Child's guardian *ad litem* (GAL), Paula C. LaStrapes, Esquire, stated her agreement "with the Findings of the trial court," and "the Counter-Statement of the Case of" CYF. Participant Brief at 3.

concern about parenting skill development and even outpatient counseling meant to slowly develop or to improve her insight, self-monitoring, her ability to interpret gray areas and be less rigid in her thought processes, that is a very long-term type of process.

*Id.* at 32-33. Dr. Della Toffalo concluded "there is not a good prognosis for a substantial improvement in those skills." *Id.* at 33.

Jillian Hauser, a "recovery specialist" with ACES, testified that between May 2021 and December 2022, she provided Mother with parenting instruction and supervised Mother's visits with Child. *Id.* at 61. Specifically, Ms. Hauser "supervised visits between [Mother] and [Child] two times a week for two hours … and [provided parenting] instruction with [Mother] for at least one hour a week." *Id.* Although Ms. Hauser did not doubt Mother's love for Child, she stated her concern that Mother remained unable to provide for Child's "physical needs, the simple shelter, clothing, food, water, stuff like that…." *Id.* at 69.

After Ms. Hauser's services ended in December 2022, Mother agreed to receive additional parenting services from Justice Works Youth Care. *Id.* at 69, 81. Brittany Marshall, who is a family resource specialist, testified she "was informed by the previous caseworker that a parenting program had just ended and [CYF] wanted to give [Mother] a chance at yet another parenting program." *Id.* at 82. Ms. Marshall began working with Mother on December 9, 2022, and continued to do so through the time of the termination hearing in February 2023. *Id.* at 83. Ms. Marshall prepared a written summary of her services, in which she wrote that Mother "has struggled to comprehend what

was being taught and would repeatedly inform [Ms. Marshall] that she took [the instruction] in a different way or misread [Ms. Marshall's] question." *Id.* at 85; Petitioner's Exhibit 5.

Based in part on the above evidence, the orphans' court concluded that Child had been removed from Mother's care for at least six months; the conditions which led to Child's removal and placement continued to exist; and termination would best serve Child's needs and welfare. *See In re Z.P.*, 994 A.2d at 1118 (discussing termination § 2511(a)(5)). The orphans' court explained:

> CYF removed [Child, who was just a few days old,] from Mother's care on February 12, 2021[.] [Child] was removed … because Mother's home was unsafe, and she had not progressed in addressing her mental health issues that had been ongoing and had been a factor in the 2017 termination of her rights to another son. **Since CYF obtained protective custody of [Child], Mother has continued to receive mental health services from multiple providers, without significant progress, and she has continued to live in conditions unsuitable for a child**.

> CYF had developed a permanency plan, and referred Mother to Carol Patterson, a psychologist, for Psychological and Parenting Assessments. Dr. Patterson conducted her evaluation on March 11, 2021, and recommended that Mother receive mental health services, a psychiatric evaluation, and parenting services.

> As early as March 2021, Dr. Patterson diagnosed Mother with Bipolar I Disorder and concluded that all factors placed Mother at risk with regard to her ability to parent a child. Several providers commented on Mother's rigid thinking and questioned whether she could make decisions under pressure.

> Furthermore, Dr. Menta had significant concerns about Mother being easily manipulated and having limited protective capacity. Dr. Menta's concerns are similar to those expressed by

Dr. [Della] Toffalo, who said that autistic individuals such as Mother are extremely naive, and are at great risk for being in situations where they can be victimized — they can miss signs of "stranger danger." The [c]ourt is troubled by this profile of Mother, considering that a parent's job is to protect their children.

Also troubling to the [c]ourt are the observations of various service providers of the conditions of Mother's home. No child should reside in a home filled with extreme clutter, cat feces and vomit, odor of cat urine, dried-up food on the stove and garbage on the kitchen floor (these conditions are depicted in the photographs taken … in October 2022). Despite being advised to purchase more litter boxes and apply baking soda to soak up the urine odor, Mother never did so.

**After more than two years of [Child's] placement in protective custody, the conditions which led to his placement continue to this day**. As Ms. Hauser testified, Mother had received "the whole gamut" of services available to anyone in Mother's situation.

**Because of Mother's failure to remedy the deficiencies in her living conditions and her little to no progress in addressing her mental health issues, termination of Mother's parental rights would best serve [Child's] needs and welfare. Since he was taken into protective custody, [Child] has been in the custody of his maternal grandparents**. The maternal grandparents have provided good care to [Child]. All of [Child's] needs, including food, shelter, getting to all his doctors' appointments, are being met.

Orphans' Court Findings and Memorandum, 3/15/23, at 17-19 (emphasis added).

We must defer to trial judges when factual findings are supported by the record. *In re Adoption of S.P.*, 47 A.3d at 826-27. As the orphans' court did not err or abuse its discretion, termination of Mother's parental rights under Section 2511(a)(5) was proper.

Section 2511(b)

In her second issue, Mother argues the trial court erred in terminating her parental rights under Section 2511(b), which requires the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Mother emphasizes she "maintained almost all visits with Child," and states that "it would appear [] all service providers testified that Mother had a positive bond with the Child." Mother's Brief at 28. Mother further claims: "Critically lacking in this case is evidence from any licensed professional regarding the strength of the bond between [M]other and [C]hild and the effect [] termination of that bond would have on [C]hild." *Id.*

CYF asserts that "there is ample clear and convincing evidence" of termination serving Child's "developmental, physical and emotional needs and welfare." CYF's Brief at 19. CYF observes that Child's needs are being met in his foster placement with maternal grandparents, where Child has lived "for over two years and essentially since birth," along with his brother, "who was adopted by the maternal grandparents." *Id.* at 19-20. CYF also references evidence that Child's "primary attachment is to the maternal grandparents." *See id.* at 20. We agree that the evidence supports termination under Section 2511(b).

When the court determines a parent's conduct warrants termination pursuant to Section 2511(a), it must then "engage in the second part of

the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." ***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007). The "extent of any [parental] bond analysis ... necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 763 (Pa. 2008). In addition to a bond examination,

> **the trial court can equally emphasize the safety needs of the child**, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

***In re A.S.***, 11 A.3d at 483 (emphasis added).

Here, CYF caseworker Maria Boltz testified to observing Child in his pre-adoptive foster home with maternal grandparents. Ms. Boltz confirmed Child was two years old and had lived with maternal grandparents, as well as his brother, "the entire time." N.T., 2/17/23, at 105. She stated:

> All of [Child's] needs are being met, [such as] food, shelter, [and] getting to all of his doctors' appointments. Grandma makes sure she has everything scheduled, ready to go and knows what's going on.

***Id.*** at 93. Ms. Boltz had no concerns about maternal grandparents adopting Child. ***Id.*** at 106.

Mother testified she lives "a few blocks down" from maternal grandparents, and still sees her older son, who her parents adopted. ***Id.*** at 162. Mother is not employed, and collects disability "due to bipolar … [and] autism …." ***Id.*** at 160-61.

After Mother testified, Child's GAL addressed the court. The GAL stated:

> Your Honor, I have watched this case for quite a long time, throughout [Mother's] first child's termination and through this time period of two years for [Child]. … [I]t does seem that [M]other loves her children, loves [Child]. But for whatever reasons, [Mother] doesn't seem to be able to change things, [and] be able to put [Child] first, do things that she needs to do to make sure everything is taken care of for [Child].
>
> ***
>
> As far as [whether termination is] in [Child's] best interest, I would say that it would be. He has been in the home of his grandparents, along with his sibling, for his entire life, for his two years, and he has fit in. He's comfortable there. He's always been well taken care of. He doesn't have any issues there ….

N.T., 2/28/23, at 165-66.

Consistent with the foregoing evidence, the orphans' court concluded Child's needs and welfare were best served by terminating Mother's parental rights. The court explained:

> Mother has limited decision-making capacity, difficulty interpreting social cues, is vulnerable, and can miss signs of "stranger danger." Mother has difficulty understanding a child's progress or growth, a crucial skill for a parent, especially the mother of a two-year-old.
>
> Moreover, despite being counseled many times on unsanitary and unsafe living conditions, Mother has failed to follow through on suggestions for remedying those conditions. Mother simply does not recognize the health and safety risks to a child living in such a household.
>
> [Child] was placed with his maternal grandparents from the beginning. They meet all of [Child's] needs, including providing food, shelter, and seeing that he gets medical care when needed. After Mother's rights to her older son were terminated, the maternal grandparents adopted him, and they would like to adopt

- 14 -

[Child]. Raising [Child] in a clean, loving home with his older brother can only benefit [Child].

Orphans' Court Findings and Memorandum, 3/15/23, at 20-21.

Our review reveals no error or abuse of discretion by the trial court in terminating Mother's parental rights under Section 2511(b). Accordingly, we affirm decree terminating Mother's parental rights.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/16/2023